Summary
2/9/2016 4:30:36 PM

<span style="color:red">Differences exist between documents.</span>

| **New Document:** | **Old Document:** |
|---|---|
| 14-857_new | 14-857 |
| 40 pages (335 KB) | 40 pages (272 KB) |
| 2/9/2016 4:30:36 PM | 2/9/2016 4:30:36 PM |
| <span style="color:red">Used to display results.</span> | |

Get started: first change is on page 9.

No pages were deleted

**How to read this report**

<span style="background-color:green">**Highlight**</span> indicates a change.
<span style="color:red">~~Deleted~~</span> indicates deleted content.
🔺 indicates pages were changed.
↔ indicates pages were moved.

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CAMPBELL-EWALD CO. *v.* GOMEZ

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 14–857.   Argued October 14, 2015—Decided January 20, 2016

The United States Navy contracted with petitioner Campbell-Ewald Company (Campbell) to develop a multimedia recruiting campaign that included the sending of text messages to young adults, but only if those individuals had "opted in" to receipt of marketing solicitations on topics that included Navy service.  Campbell's subcontractor Mindmatics LLC generated a list of cellular phone numbers for consenting 18- to 24-year-old users and then transmitted the Navy's message to over 100,000 recipients, including respondent Jose Gomez, who alleges that he did not consent to receive text messages and, at age 40, was not in the Navy's targeted age group.  Gomez filed a nationwide class action, alleging that Campbell violated the Telephone Consumer Protection Act (TCPA), 47 U. S. C. §227(b)(1)(A)(iii), which prohibits "using any automatic dialing system" to send a text message to a cellular telephone, absent the recipient's prior express consent.  He sought treble statutory damages for a willful and knowing TCPA violation and an injunction against Campbell's involvement in unsolicited messaging.

Before the deadline for Gomez to file a motion for class certification, Campbell proposed to settle Gomez's individual claim and filed an offer of judgment pursuant to Federal Rule of Civil Procedure 68.  Gomez did not accept the offer and allowed the Rule 68 submission to lapse on expiration of the time (14 days) specified in the Rule.  Campbell then moved to dismiss the case pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction.  Campbell argued first that its offer mooted Gomez's individual claim by providing him with complete relief.  Next, Campbell urged that Gomez's failure to move for class certification before his individual claim became moot caused the putative class claims to become moot as well.  The District Court de-

nied the motion. After limited discovery, the District Court granted Campbell's motion for summary judgment. Relying on *Yearsley* v. *W. A. Ross Constr. Co.*, 309 U. S. 18, the court held that Campbell, as a contractor acting on the Navy's behalf, acquired the Navy's sovereign immunity from suit under the TCPA. The Ninth Circuit reversed. It agreed that Gomez's case remained live but concluded that Campbell was not entitled to "derivative sovereign immunity" under *Yearsley* or on any other basis.

*Held*:

1. An unaccepted settlement offer or offer of judgment does not moot a plaintiff's case, so the District Court retained jurisdiction to adjudicate Gomez's complaint.

Article III's "cases" and "controversies" limitation requires that "an actual controversy . . . be extant at all stages of review, not merely at the time the complaint is filed," *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 67 (internal quotation marks omitted), but a case does not become moot as "long as the parties have a concrete interest, however small," in the litigation's outcome, *Chafin* v. *Chafin*, 568 U. S. ___, ___ (internal quotation marks omitted).

Gomez's complaint was not effaced by Campbell's unaccepted offer to satisfy his individual claim. Under basic principles of contract law, Campbell's settlement bid and Rule 68 offer of judgment, once rejected, had no continuing efficacy. With no settlement offer operative, the parties remained adverse; both retained the same stake in the litigation they had at the outset. Neither Rule 68 nor the 19th-century railroad tax cases *California* v. *San Pablo & Tulare R. Co.*, 149 U. S. 308, *Little* v. *Bowers*, 134 U. S. 547, and *San Mateo County* v. *Southern Pacific R. Co.*, 116 U. S. 138, support the argument that an unaccepted settlement offer can moot a complaint. Pp. 6–12.

2. Campbell's status as a federal contractor does not entitle it to immunity from suit for its violation of the TCPA. Unlike the United States and its agencies, federal contractors do not enjoy absolute immunity. A federal contractor who simply performs as directed by the Government may be shielded from liability for injuries caused by its conduct. See *Yearsley*, 309 U. S., at 20–21. But no "derivative immunity" exists when the contractor has "exceeded [its] authority" or its authority "was not validly conferred." *Id.*, at 21. The summary judgment record includes evidence that the Navy authorized Campbell to send text messages only to individuals who had "opted in" to receive solicitations, as required by the TCPA. When a contractor violates both federal law and the Government's explicit instructions, as alleged here, no immunity shields the contractor from suit. Pp. 12–14.

Syllabus

768 F. 3d 871, affirmed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment. ROBERTS, C. J., filed a dissenting opinion, in which SCALIA and ALITO, JJ., joined. ALITO, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES
_____

No. 14–857
_____

## CAMPBELL-EWALD COMPANY, PETITIONER *v.* JOSE GOMEZ

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[January 20, 2016]

JUSTICE GINSBURG delivered the opinion of the Court.

Is an unaccepted offer to satisfy the named plaintiff's individual claim sufficient to render a case moot when the complaint seeks relief on behalf of the plaintiff and a class of persons similarly situated?  This question, on which Courts of Appeals have divided, was reserved in *Genesis HealthCare Corp.* v. *Symczyk*, 569 U. S. \_\_\_, \_\_\_, \_\_\_, n. 4 (2013) (slip op., at 5, 6, n. 4).  We hold today, in accord with Rule 68 of the Federal Rules of Civil Procedure, that an unaccepted settlement offer has no force.  Like other unaccepted contract offers, it creates no lasting right or obligation.  With the offer off the table, and the defendant's continuing denial of liability, adversity between the parties persists.

This case presents a second question.  The claim in suit concerns performance of the petitioner's contract with the Federal Government.  Does the sovereign's immunity from suit shield the petitioner, a private enterprise, as well?  We hold that the petitioner's status as a Government contractor does not entitle it to "derivative sovereign immunity," *i.e.,* the blanket immunity enjoyed by the

sovereign.

## I

The Telephone Consumer Protection Act (TCPA or Act) 48 Stat. 1064, 47 U. S. C. §227(b)(1)(A)(iii), prohibits any person, absent the prior express consent of a telephone-call recipient, from "mak[ing] any call . . . using any automatic telephone dialing system . . . to any telephone number assigned to a paging service [or] cellular telephone service." A text message to a cellular telephone, it is undisputed, qualifies as a "call" within the compass of §227(b)(1)(A)(iii). 768 F. 3d 871, 874 (CA9 2014). For damages occasioned by conduct violating the TCPA, §227(b)(3) authorizes a private right of action. A plaintiff successful in such an action may recover her "actual monetary loss" or $500 for each violation, "whichever is greater." Damages may be trebled if "the defendant willfully or knowingly violated" the Act.

Petitioner Campbell-Ewald Company (Campbell) is a nationwide advertising and marketing communications agency. Beginning in 2000, the United States Navy engaged Campbell to develop and execute a multimedia recruiting campaign. In 2005 and 2006, Campbell proposed to the Navy a campaign involving text messages sent to young adults, the Navy's target audience, encouraging them to learn more about the Navy. The Navy approved Campbell's proposal, conditioned on sending the messages only to individuals who had "opted in" to receipt of marketing solicitations on topics that included service in the Navy. App. 42. In final form, the message read:

> "Destined for something big? Do it in the Navy. Get a career. An education. And a chance to serve a greater cause. For a FREE Navy video call [phone number]." 768 F. 3d, at 873.

Campbell then contracted with Mindmatics LLC, which

generated a list of cellular phone numbers geared to the Navy's target audience—namely, cellular phone users between the ages of 18 and 24 who had consented to receiving solicitations by text message. In May 2006, Mindmatics transmitted the Navy's message to over 100,000 recipients.

Respondent Jose Gomez was a recipient of the Navy's recruiting message. Alleging that he had never consented to receiving the message, that his age was nearly 40, and that Campbell had violated the TCPA by sending the message (and perhaps others like it), Gomez filed a class-action complaint in the District Court for the Central District of California in 2010. On behalf of a nationwide class of individuals who had received, but had not consented to receipt of, the text message, Gomez sought treble statutory damages, costs, and attorney's fees, also an injunction against Campbell's involvement in unsolicited messaging. App. 16–24.

Prior to the agreed-upon deadline for Gomez to file a motion for class certification, Campbell proposed to settle Gomez's individual claim and filed an offer of judgment pursuant to Federal Rule of Civil Procedure 68. App. to Pet. for Cert. 52a–61a.[1] Campbell offered to pay Gomez

_____

[1] Federal Rule of Civil Procedure 68 provides, in relevant part:

"**(a) Making an Offer; Judgment on an Accepted Offer.** At least 14 days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued. If, within 14 days after being served, the opposing party serves written notice accepting the offer, either party may then file the offer and notice of acceptance, plus proof of service. The clerk must then enter judgment.

"**(b) Unaccepted Offer.** An unaccepted offer is considered withdrawn, but it does not preclude a later offer. Evidence of an unaccepted offer is not admissible except in a proceeding to determine costs.

.      .      .      .      .

"**(d) Paying Costs After an Unaccepted Offer.** If the judgment that the offeree finally obtains is not more favorable than the un-

his costs, excluding attorney's fees, and $1,503 per mes-
sage for the May 2006 text message and any other text
message Gomez could show he had received, thereby
satisfying his personal treble-damages claim. *Id.,* at 53a.
Campbell also proposed a stipulated injunction in which it
agreed to be barred from sending text messages in viola-
tion of the TCPA. The proposed injunction, however,
denied liability and the allegations made in the complaint,
and disclaimed the existence of grounds for the imposition
of an injunction. *Id*., at 56a. The settlement offer did not
include attorney's fees, Campbell observed, because the
TCPA does not provide for an attorney's-fee award. *Id.,* at
53a. Gomez did not accept the settlement offer and al-
lowed Campbell's Rule 68 submission to lapse after the
time, 14 days, specified in the Rule.

Campbell thereafter moved to dismiss the case pursuant
to Federal Rule of Civil Procedure 12(b)(1) for lack of
subject-matter jurisdiction. No Article III case or contro-
versy remained, Campbell urged, because its offer mooted
Gomez's individual claim by providing him with complete
relief. Gomez had not moved for class certification before
his claim became moot, Campbell added, so the putative
class claims also became moot. The District Court denied
Campbell's motion. 805 F. Supp. 2d 923 (CD Cal. 2011).[2]
Gomez was not dilatory in filing his certification request,
the District Court determined; consequently, the court
noted, the class claims would "relat[e] back" to the date
Gomez filed the complaint. *Id.,* at 930–931.

After limited discovery, Campbell moved for summary
judgment on a discrete ground. The U. S. Navy enjoys the
sovereign's immunity from suit under the TCPA, Camp-

_____

accepted offer, the offeree must pay the costs incurred after the offer
was made."

[2] Because Campbell had already answered the complaint, the District
Court construed Campbell's motion as a request for summary judg-
ment. 805 F. Supp. 2d, at 927, n. 2.

bell argued. The District Court granted the motion. Relying on our decision in *Yearsley* v. *W. A. Ross Constr. Co.*, 309 U. S. 18 (1940), the court held that, as a contractor acting on the Navy's behalf, Campbell acquired the Navy's immunity. No. CV 10–02007DMG (CD Cal., Feb. 22, 2013), App. to Pet. for Cert. 22a–34a, 2013 WL 655237.

The Court of Appeals for the Ninth Circuit reversed the summary judgment entered for Campbell. 768 F. 3d 871. The appeals court disagreed with the District Court's ruling on the immunity issue, but agreed that Gomez's case remained live. Concerning Gomez's individual claim, the Court of Appeals relied on its then-recent decision in *Diaz* v. *First American Home Buyers Protection Corp.*, 732 F. 3d 948 (2013). *Diaz* held that "an unaccepted Rule 68 offer that would fully satisfy a plaintiff's [individual] claim is insufficient to render th[at] claim moot." *Id.,* at 950. As to the class relief Gomez sought, the Ninth Circuit held that "an unaccepted Rule 68 offer of judgment— for the full amount of the named plaintiff's individual claim and made before the named plaintiff files a motion for class certification—does not moot a class action." 768 F. 3d, at 875 (quoting *Pitts* v. *Terrible Herbst, Inc.*, 653 F. 3d 1081, 1091–1092 (CA9 2011)).

Next, the Court of Appeals held that Campbell was not entitled to "derivative sovereign immunity" under this Court's decision in *Yearsley* or on any other basis. 768 F. 3d, at 879–881. Vacating the District Court's judgment, the Ninth Circuit remanded the case for further proceedings.[3]

We granted certiorari to resolve a disagreement among the Courts of Appeals over whether an unaccepted offer can moot a plaintiff's claim, thereby depriving federal courts of Article III jurisdiction. Compare *Bais Yaakov* v.

---

[3] The Court of Appeals stayed its mandate pending proceedings in this Court. App. to Pet. for Cert. 62a–63a.

*Act, Inc.*, 798 F. 3d 46, 52 (CA1 2015); *Hooks* v. *Landmark Industries, Inc.*, 797 F. 3d 309, 315 (CA5 2015); *Chapman* v. *First Index, Inc.*, 796 F. 3d 783, 787 (CA7 2015); *Tanasi* v. *New Alliance Bank*, 786 F. 3d 195, 200 (CA2 2015); *Stein* v. *Buccaneers Limited Partnership*, 772 F. 3d 698, 703 (CA11 2014); *Diaz*, 732 F. 3d, at 954–955 (holding that an unaccepted offer does not render a plaintiff's claim moot), with *Warren* v. *Sessoms & Rogers, P. A.*, 676 F. 3d 365, 371 (CA4 2012); *O'Brien* v. *Ed Donnelly Enterprises, Inc.*, 575 F. 3d 567, 574–575 (CA6 2009); *Weiss* v. *Regal Collections*, 385 F. 3d 337, 340 (CA3 2004) (noting that an unaccepted offer can moot an individual plaintiff's claim). We granted review as well to resolve the federal contractor immunity question Campbell's petition raised. 575 U. S. ___ (2015).

II

Article III of the Constitution limits federal-court jurisdiction to "cases" and "controversies." U. S. Const., Art. III, §2. We have interpreted this requirement to demand that "an actual controversy . . . be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 67 (1997) (quoting *Preiser* v. *Newkirk*, 422 U. S. 395, 401 (1975)). "If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Genesis HealthCare Corp.*, 569 U. S., at ___ (slip op., at 4) (quoting *Lewis* v. *Continental Bank Corp.*, 494 U. S. 472, 477–478 (1990)). A case becomes moot, however, "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox* v. *Service Employees*, 567 U. S. ___, ___ (2012) (slip op., at 7) (internal quotation marks omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation,

the case is not moot." *Chafin* v. *Chafin*, 568 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 6) (internal quotation marks omitted).

In *Genesis HealthCare*, the Court considered a collective action brought by Laura Symczyk, a former employee of Genesis HealthCare Corp. Symczyk sued on behalf of herself and similarly situated employees for alleged violations of the Fair Labor Standards Act of 1938, 29 U. S. C. §201 *et seq.* In that case, as here, the defendant served the plaintiff with an offer of judgment pursuant to Rule 68 that would have satisfied the plaintiff's individual damages claim. 569 U. S., at \_\_\_ (slip op., at 2). Also as here, the plaintiff allowed the offer to lapse by failing to respond within the time specified in the Rule. *Ibid.* But unlike the case Gomez mounted, Symczyk did not dispute in the lower courts that Genesis HealthCare's offer mooted her individual claim. *Id.,* at \_\_\_ (slip op., at 5). Because of that failure, the *Genesis HealthCare* majority refused to rule on the issue. Instead, the majority simply assumed, without deciding, that an offer of complete relief pursuant to Rule 68, even if unaccepted, moots a plaintiff's claim. *Ibid.* Having made that assumption, the Court proceeded to consider whether the action remained justiciable on the basis of the collective-action allegations alone. Absent a plaintiff with a live individual case, the Court concluded, the suit could not be maintained. *Id.,* at \_\_\_ (slip op., at 6).

JUSTICE KAGAN, writing in dissent, explained that she would have reached the threshold question and would have held that "an unaccepted offer of judgment cannot moot a case." *Id.,* at \_\_\_ (slip op., at 3). She reasoned:

"When a plaintiff rejects such an offer—however good the terms—her interest in the lawsuit remains just what it was before. And so too does the court's ability to grant her relief. An unaccepted settlement offer—like any unaccepted contract offer—is a legal nullity, with no operative effect. As every first-year law stu-

dent learns, the recipient's rejection of an offer 'leaves the matter as if no offer had ever been made.' *Minneapolis & St. Louis R. Co.* v. *Columbus Rolling Mill*, 119 U. S. 149, 151 (1886). Nothing in Rule 68 alters that basic principle; to the contrary, that rule specifies that '[a]n unaccepted offer is considered withdrawn.' Fed. Rule Civ. Proc. 68(b). So assuming the case was live before—because the plaintiff had a stake and the court could grant relief—the litigation carries on, unmooted." *Ibid.*

We now adopt JUSTICE KAGAN's analysis, as has every Court of Appeals ruling on the issue post *Genesis HealthCare*.[4] Accordingly, we hold that Gomez's complaint was not effaced by Campbell's unaccepted offer to satisfy his individual claim.

As earlier recounted, see *supra*, at 3–4, Gomez commenced an action against Campbell for violation of the TCPA, suing on behalf of himself and others similarly situated. Gomez sought treble statutory damages and an injunction on behalf of a nationwide class, but Campbell's settlement offer proposed relief for Gomez alone, and it did not admit liability. App. to Pet. for Cert. 58a. Gomez rejected Campbell's settlement terms and the offer of judgment.

Under basic principles of contract law, Campbell's settlement bid and Rule 68 offer of judgment, once rejected, had no continuing efficacy. See *Genesis HealthCare*, 569 U. S., at ___ (KAGAN, J., dissenting) (slip op., at 3). Absent Gomez's acceptance, Campbell's settlement offer remained

---

[4]See *Bais Yaakov* v. *Act, Inc.*, 798 F. 3d 46, 51–52 (CA1 2015); *Hooks* v. *Landmark Industries, Inc.*, 797 F. 3d 309, 314–315 (CA5 2015); *Chapman* v. *First Index, Inc.*, 796 F. 3d 783, 786–787 (CA7 2015); *Tanasi* v. *New Alliance Bank*, 786 F. 3d 195, 199–200 (CA2 2015); *Stein* v. *Buccaneers Limited Partnership*, 772 F. 3d 698, 702–703 (CA11 2014); *Diaz* v. *First American Home Buyers Corp.*, 732 F. 3d 948, 953–955 (CA9 2013).

only a proposal, binding neither Campbell nor Gomez. See App. to Pet. for Cert. 59a ("Please advise whether Mr. Gomez will accept [Campbell's] offer . . . ."). Having rejected Campbell's settlement bid, and given Campbell's continuing denial of liability, Gomez gained no entitlement to the relief Campbell previously offered. See *Eliason* v. *Henshaw*, 4 Wheat. 225, 228 (1819) ("It is an undeniable principle of the law of contracts, that an offer of a bargain by one person to another, imposes no obligation upon the former, until it is accepted by the latter . . . ."). In short, with no settlement offer still operative, the parties remained adverse; both retained the same stake in the litigation they had at the outset.

The Federal Rule in point, Rule 68, hardly supports the argument that an unaccepted settlement offer can moot a complaint. An offer of judgment, the Rule provides, "is considered withdrawn" if not accepted within 14 days of its service. Fed. Rule Civ. Proc. 68(a), (b). The sole built-in sanction: "If the [ultimate] judgment . . . is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made." Rule 68(d).

In urging that an offer of judgment can render a controversy moot, Campbell features a trio of 19th-century railroad tax cases: *California* v. *San Pablo & Tulare R. Co.*, 149 U. S. 308 (1893), *Little* v. *Bowers*, 134 U. S. 547 (1890), and *San Mateo County* v. *Southern Pacific R. Co.*, 116 U. S. 138 (1885). None of those decisions suggests that an *unaccepted* settlement offer can put a plaintiff out of court. In *San Pablo*, California had sued to recover state and county taxes due from a railroad. In response, the railroad had not merely offered to pay the taxes in question. It had actually deposited the full amount demanded in a California bank in the State's name, in accord with a California statute that "extinguished" the railroad's tax obligations upon such payment. 149 U. S., at 313–314. *San Pablo* thus rested on California's substantive law,

which required the State to accept a taxpayer's full pay-
ment of the amount in controversy. *San Mateo* and *Little*
similarly involved actual payment of the taxes for which
suit was brought. In all three cases, the railroad's pay-
ments had fully satisfied the asserted tax claims, and so
extinguished them. *San Mateo*, 116 U. S., at 141–142;
*Little*, 134 U. S., at 556.[5]

In contrast to the cases Campbell highlights, when the

_____

[5] In addition to *California* v. *San Pablo & Tulare R. Co.*, 149 U. S. 308
(1893), THE CHIEF JUSTICE maintains, two recent decisions of the Court
support its position: *Alvarez* v. *Smith*, 558 U. S. 87 (2009), and *Already,
LLC* v. *Nike, Inc.*, 568 U. S. ___ (2013). See *post,* at 6–9 (dissenting
opinion). The Court's reasoning in those opinions, however, is con-
sistent with our decision in this case. In *Alvarez*, the Court found moot
claims for injunctive and declaratory relief in relation to cars and cash
seized by the police. Through separate state-court proceedings, the
State had "returned all the cars that it seized," and the plaintiff-
property owners had "either forfeited any relevant cash or ha[d] accepted
as final the State's return of some of it." 558 U. S., at 89, 95–96.
*Alvarez* thus resembles the railroad tax cases described above: The
*Alvarez* plaintiffs had in fact received all the relief they could claim, all
"underlying property disputes" had ended, *id.,* at 89, and as the com-
plaint sought "only declaratory and injunctive relief, not damages," *id.,*
at 92, no continuing controversy remained.

*Already* concerned a trademark owned by Nike. Already sought a
declaratory judgment invalidating the trademark. The injury Already
asserted was the ongoing threat that Nike would sue for trademark
infringement. In response to Already's claim, Nike filed a "Covenant
Not to Sue," in which it promised not to bring any trademark claims
based on Already's existing or similar footwear designs. 568 U. S., at
___ (slip op., at 2). The Court found this covenant sufficient to over-
come the rule that "voluntary cessation" is generally inadequate to
moot a claim. *Id.,* at ___ (slip op., at 6). True, Nike's covenant was
unilateral, but it afforded Already blanket protection from future
trademark litigation. *Id.,* at ___ (slip op., at 8). The risk that under-
pinned Already's standing—the Damocles' sword of a trademark
infringement suit—thus ceased to exist given Nike's embracive promise
not to sue. In short, in both *Alvarez* and *Already*, the plaintiffs had
received full redress for the injuries asserted in their complaints. Here,
by contrast, Campbell's revocable offer, far from providing Gomez the
relief sought in his complaint, gave him nary a penny.

settlement offer Campbell extended to Gomez expired, Gomez remained emptyhanded; his TCPA complaint, which Campbell opposed on the merits, stood wholly unsatisfied. Because Gomez's individual claim was not made moot by the expired settlement offer, that claim would retain vitality during the time involved in determining whether the case could proceed on behalf of a class. While a class lacks independent status until certified, see *Sosna* v. *Iowa*, 419 U. S. 393, 399 (1975), a would-be class representative with a live claim of her own must be accorded a fair opportunity to show that certification is warranted.

THE CHIEF JUSTICE's dissent asserts that our decision transfers authority from the federal courts and "hands it to the plaintiff." *Post*, at 10. Quite the contrary. The dissent's approach would place the defendant in the driver's seat. We encountered a kindred strategy in *U. S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, 513 U. S. 18 (1994). The parties in *Bancorp* had reached a voluntary settlement while the case was pending before this Court. *Id.,* at 20. The petitioner then sought vacatur of the Court of Appeals' judgment, contending that it should be relieved from the adverse decision on the ground that the settlement made the dispute moot. The Court rejected this gambit. *Id.,* at 25. Similarly here, Campbell sought to avoid a potential adverse decision, one that could expose it to damages a thousand-fold larger than the bid Gomez declined to accept.

In sum, an unaccepted settlement offer or offer of judgment does not moot a plaintiff's case, so the District Court retained jurisdiction to adjudicate Gomez's complaint. That ruling suffices to decide this case. We need not, and do not, now decide whether the result would be different if a defendant deposits the full amount of the plaintiff's individual claim in an account payable to the plaintiff, and the court then enters judgment for the plaintiff in that amount. That question is appropriately reserved for a

case in which it is not hypothetical.

### III

The second question before us is whether Campbell's status as a federal contractor renders it immune from suit for violating the TCPA by sending text messages to unconsenting recipients. The United States and its agencies, it is undisputed, are not subject to the TCPA's prohibitions because no statute lifts their immunity. Brief for Petitioner 2; Brief for Respondent 43. Do federal contractors share the Government's unqualified immunity from liability and litigation? We hold they do not.

"[G]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Brady* v. *Roosevelt S. S. Co.*, 317 U. S. 575, 583 (1943). That immunity, however, unlike the sovereign's, is not absolute. See *id.,* at 580–581. Campbell asserts "derivative sovereign immunity," Brief for Petitioner 35, but can offer no authority for the notion that private persons performing Government work acquire the Government's embracive immunity. When a contractor violates both federal law and the Government's explicit instructions, as here alleged, no "derivative immunity" shields the contractor from suit by persons adversely affected by the violation.

Campbell urges that two of our decisions support its "derivative immunity" defense: *Yearsley*, 309 U. S. 18, and *Filarsky* v. *Delia*, 566 U. S. ___ (2012). In *Yearsley*, a landowner asserted a claim for damages against a private company whose work building dikes on the Missouri River pursuant to its contract with the Federal Government had washed away part of the plaintiff's land. We held that the contractor was not answerable to the landowner. "[T]he work which the contractor had done in the river bed," we observed, "was all authorized and directed by the Government of the United States" and "performed pursuant to

the Act of Congress." 309 U. S., at 20 (internal quotation marks omitted). Where the Government's "authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress," we explained, "there is no liability on the part of the contractor" who simply performed as the Government directed. *Id.*, at 20–21.[6] The Court contrasted with *Yearsley* cases in which a Government agent had "exceeded his authority" or the authority "was not validly conferred"; in those circumstances, the Court said, the agent could be held liable for conduct causing injury to another. *Id.*, at 21.[7]

In *Filarsky*, we considered whether a private attorney temporarily retained by a municipal government as an investigator could claim qualified immunity in an action brought under 42 U. S. C. §1983. Finding no distinction in the common law "between public servants and private individuals engaged in public service," we held that the investigator could assert "qualified immunity" in the lawsuit. 566 U. S., at \_\_\_, \_\_\_ (slip op., at 8, 5). Qualified immunity reduces the risk that contractors will shy away from government work. But the doctrine is bounded in a way that Campbell's "derivative immunity" plea is not. "Qualified immunity may be overcome . . . if the defendant knew or should have known that his conduct violated a right 'clearly established' at the time of the episode in suit." *Id.,* at \_\_\_ (GINSBURG, J., concurring) (slip op., at 1)

---

[6] If there had been a taking of the plaintiff's property, the Court noted, "a plain and adequate remedy" would be at hand, *i.e.,* recovery from the United States of "just compensation." *Yearsley*, 309 U. S., at 21.

[7] We disagree with the Court of Appeals to the extent that it described *Yearsley* as "establish[ing] a narrow rule regarding claims arising out of property damage caused by public works projects." 768 F. 3d, at 879. Critical in *Yearsley* was not the involvement of public works, but the contractor's performance in compliance with all federal directions.

(citing *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982)). Campbell does not here contend that the TCPA's requirements or the Navy's instructions failed to qualify as "clearly established."

At the pretrial stage of litigation, we construe the record in a light favorable to the party seeking to avoid summary disposition, here, Gomez. *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 587 (1986). In opposition to summary judgment, Gomez presented evidence that the Navy authorized Campbell to send text messages only to individuals who had "opted in" to receive solicitations. App. 42–44; 768 F. 3d, at 874. A Navy representative noted the importance of ensuring that the message recipient list be "kosher" (*i.e.,* that all recipients had consented to receiving messages like the recruiting text), and made clear that the Navy relied on Campbell's representation that the list was in compliance. App. 43. See also *ibid.* (noting that Campbell itself encouraged the Navy to use only an opt-in list in order to meet national and local law requirements). In short, the current record reveals no basis for arguing that Gomez's right to remain message-free was in doubt or that Campbell complied with the Navy's instructions.

We do not overlook that subcontractor Mindmatics, not Campbell, dispatched the Navy's recruiting message to unconsenting recipients. But the Federal Communications Commission has ruled that, under federal common-law principles of agency, there is vicarious liability for TCPA violations. *In re Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574 (2013). The Ninth Circuit deferred to that ruling, 768 F. 3d, at 878, and we have no cause to question it. Campbell's vicarious liability for Mindmatics' conduct, however, in no way advances Campbell's contention that it acquired the sovereign's immunity from suit based on its contract with the Navy.

Opinion of the Court

\*     \*     \*

For the reasons stated, the judgment of the Court of Appeals for the Ninth Circuit is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–857

_____

## CAMPBELL-EWALD COMPANY, PETITIONER
## *v*. JOSE GOMEZ

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[January 20, 2016]

JUSTICE THOMAS, concurring in the judgment.

The Court correctly concludes that an offer of complete relief on a claim does not render that claim moot. But, in my view, the Court does not advance a sound basis for this conclusion. The Court rests its conclusion on modern contract law principles and a recent dissent concerning Federal Rule of Civil Procedure 68. See *ante,* at 6–9. I would rest instead on the common-law history of tenders. That history—which led to Rule 68—demonstrates that a mere offer of the sum owed is insufficient to eliminate a court's jurisdiction to decide the case to which the offer related. I therefore concur only in the judgment.

## I

The text of Article III's case-or-controversy requirement, that requirement's drafting history, and our precedents do not appear to provide sufficiently specific principles to resolve this case. When faced with such uncertainty, it seems particularly important for us to look to how courts traditionally have viewed a defendant's offer to pay the plaintiff's alleged damages. That history—which stretches from the common law directly to Rule 68 and modern settlement offers—reveals one unbroken practice that should resolve this case: A defendant's offer to pay the plaintiff—without more—would not have deprived a court

of jurisdiction. Campbell-Ewald's offers thus do not bar federal courts from continuing to hear this case.

### A

Modern settlement procedure has its origins in the law of tenders, as refined in the 18th and 19th centuries. As with much of the early common law, the law of tenders had many rigid formalities. These formalities make clear that, around the time of the framing, a mere offer of relief was insufficient to deprive a court of jurisdiction.

At common law, a prospective defendant could prevent a case from proceeding, but he needed to provide substantially more than a bare offer. A "mere proposal or proposition" to pay a claim was inadequate to end a case. A. Hunt, A Treatise on the Law of Tender, and Bringing Money Into Court §§1–2, 3–4 (1903) (Hunt) (citing cases from the 1800's). Nor would a defendant's "readiness and an ability to pay the money" suffice to end a case. *Holmes* v. *Holmes*, 12 Barb. 137, 144 (N. Y. 1851). Rather, a prospective defendant needed to provide a "tender"—an offer to pay the entire claim before a suit was filed, accompanied by "actually produc[ing]" the sum "at the time of tender" in an "unconditional" manner. M. Bacon, A New Abridgment of the Law, 314–315, 321 (1856) (citing cases from the early 1800's).

Furthermore, in state and federal courts, a tender of the amount due was deemed "an admission of a liability" on the cause of action to which the tender related, so any would-be defendant who tried to deny liability could not effectuate a tender. Hunt §400, at 448; see *Cottier* v. *Stimpson*, 18 F. 689, 691 (Ore. 1883) (explaining that a tender constitutes "an admission of the cause of action"); *The Rossend Castle Dillenback* v. *The Rossend Castle*, 30 F. 462, 464 (SDNY 1887) (same). As one treatise explained, "[a] tender must be of a specific sum which the tenderor *admits* to be due"—"[t]here must be no denial of

the debt." Hunt §242, at 253 (emphasis added). The tender had to offer and actually deliver complete relief. See *id.*, §2, at 4; *Sheredine* v. *Gaul*, 2 Dall. 190, 191 (Pa. 1792) (defendant must "brin[g] the money into Court"). And an offer to pay less than what was demanded was not a valid tender. See, *e.g., Elderkin* v. *Fellows*, 60 Wis. 339, 340–341, 19 N. W. 101, 102 (1884).

Even when a potential defendant properly effectuated a tender, the case would not necessarily end. At common law, a plaintiff was entitled to "deny that [the tender was] sufficient to satisfy his demand" and accordingly "go on to trial." *Raiford* v. *Governor*, 29 Ala. 382, 384 (1856); see also Hunt §511, at 595.*

This history demonstrates that, at common law, a defendant or prospective defendant had to furnish far more than a mere offer of settlement to end a case. This history also demonstrates that courts at common law would not have understood a mere offer to strip them of jurisdiction.

B

Although 19th-century state statutes expanded the common-law-tender regime, the law retained its essential features. See Bone, "To Encourage Settlement": Rule 68, Offers of Judgment, and the History of the Federal Rules of Civil Procedure, 102 Nw. U. L. Rev. 1561, 1585 (2008) (Bone). These changes, for example, allowed defendants to offer a tender "during the pendency of an action," as well as before it commenced. *Taylor* v. *Brooklyn Elevated*

————————

*Nevertheless, the common law strongly encouraged a plaintiff to accept a tender by penalizing plaintiffs who improperly rejected them. A plaintiff would not be able to recover any damages that accrued after the tender, nor could he receive the costs of the suit if the jury returned a verdict for either the amount offered or less. See Hunt §§363–364, at 403–404. This rule remains today. See Fed. Rule Civ. Proc. 68(d) (taxing costs to plaintiff who fails to recover more than the offer of judgment).

*R. Co.*, 119 N. Y. 561, 564, 23 N. E. 1106, 1107 (1890); cf. *Colby* v. *Reed*, 99 U. S. 560, 566 (1879) (at common law, generally no "right of tender after action brought"). Statutes also expanded the right of tender to cover types of actions in which damages were not certain. Compare *Dedekam* v. *Vose*, 7 F. Cas. 337, 338 (SDNY 1853) ("[T]ender could not be maintained, according to the strict principles of the common law" in cases where damages were not easily ascertainable), with *Patrick* v. *Illawaco Oyster Co.*, 189 Wash. 152, 155, 63 P. 2d 520, 521 (1937) (state statute "extend[ed] the common-law rule" to tort actions).

Nevertheless, state statutes generally retained the core of the common-law tender rules. Most critically for this case, a mere offer remained insufficient to end a lawsuit. See, *e.g., Kilts* v. *Seeber,* 10 How. Pr. 270, 271 (N. Y. 1854) (under New York law, a mere offer was insufficient to preclude litigation). Like the common-law tender rules, state statutes recognized that plaintiffs could continue to pursue litigation by rejecting an offer. See Bone 1586.

## C

The offer-of-judgment procedure in Rule 68 was modeled after a provision in the New York Field Code that was enacted in the mid-19th century. See *id.*, at 1583–1584. That code abrogated many of the common-law formalities governing civil procedure. Among its innovations, the code allowed defendants in any cause of action to make an offer in writing to the plaintiff proposing to accept judgment against the defendant for a specified sum. See The Code of Procedure of the State of New York From 1848 to 1871: Comprising the Act as Originally Enacted and the Various Amendments Made Thereto, to the Close of the Session of 1870 §385, p. 274 (1870). The plaintiff could accept the offer, which would end the litigation, or reject the offer, in which case the offer was considered with-

drawn without any admission of liability by the defendant.
*Ibid.*

In 1938, Rule 68 was adopted as part of the Federal
Rules of Civil Procedure, and has subsisted throughout
the years without material changes. See Bone 1564. As it
did in 1938, Rule 68 now authorizes "a party defending
against a claim" to "serve on an opposing party an offer to
allow judgment on specified terms." Rule 68(a). Rule 68
also provides a plaintiff the option to accept or reject an
offer. If the plaintiff accepts the offer, the "clerk must
then enter judgment," but "[a]n unaccepted offer is consid-
ered withdrawn." Rules 68(a)–(b). Withdrawn offers
(unlike common-law tenders) cannot be used in court as an
admission against defendants. Rule 68(b).

## D

In light of the history discussed above, a rejected offer
does not end the case. And this consistent historical prac-
tice demonstrates why Campbell-Ewald's offers do not
divest a federal court of jurisdiction to entertain Gomez's
suit. Campbell-Ewald made two settlement offers after
Gomez sued—one filed with the District Court under Rule
68 and one freestanding settlement offer. But with nei-
ther of these offers did the company make payment; it only
declared its intent to pay. Because Campbell-Ewald only
offered to pay Gomez's claim but took no further steps, the
court was not deprived of jurisdiction.

## II

Although the Court reaches the right result, I cannot
adopt its reasoning. Building on the dissent in *Genesis
HealthCare Corp.* v. *Symczyk*, 569 U. S. \_\_\_ (2013), the
Court relies on principles of contract law that an unac-
cepted offer is a legal nullity. But the question here is not
whether Campbell-Ewald's offer formed an enforceable
contract. The question is whether its continuing offer of

complete relief eliminated the case or controversy required by Article III. By looking only to contract law and one recent Rule 68 opinion, the Court fails to confront this broader issue. Instead, I believe that we must resolve the meaning of "case" and "controversy" in Article III by looking to "the traditional, fundamental limitations upon the powers of common-law courts" because "cases" and "controversies" "have virtually no meaning except by reference to that tradition." *Honig* v. *Doe*, 484 U. S. 305, 340 (1988) (SCALIA, J., dissenting).

THE CHIEF JUSTICE's dissent argues that examining whether the requirements of common-law tenders have been met does not answer "whether there is a case or controversy for purposes of Article III." *Post*, at 9, n. 3. As explained above, however, courts have historically refused to dismiss cases when an offer did not conform to the strict tender rules. The logical implications of THE CHIEF JUSTICE's reasoning are that the common-law-tender rules conflict with Article III and that the Constitution bars Article III courts from following those principles. But see *Colby*, *supra*, at 566 (stating that, to stop litigation, a party "must adopt the measure prescribed by the common law, except in jurisdictions where a different mode of proceeding is prescribed by statute"). That reasoning, therefore, calls into question the history and tradition that the case-or-controversy requirement embodies.

THE CHIEF JUSTICE also contends that our precedents "plainly establish that an admission of liability is not required for a case to be moot under Article III." *Post*, at 10, n. 3. But we need not decide today whether compliance with every common-law formality would be necessary to end a case. The dispositive point is that state and federal courts have not considered a mere offer, without more, sufficient to moot the case. None of the cases cited by THE CHIEF JUSTICE hold that a retrospective claim for money damages can become moot based on a mere offer.

*California* v. *San Pablo & Tulare R. Co.*, 149 U. S. 308 (1893), is inapposite because that decision involved a fully tendered offer that extinguished the tax debt under California law. *Id.,* at 313–314. *Alvarez* v. *Smith*, 558 U. S. 87 (2009), and *Already, LLC* v. *Nike, Inc.*, 568 U. S. \_\_\_ (2013), are also not on point. Both involved claims for injunctive or declaratory relief that became moot when the defendants ceased causing actual or threatened injury. But whether a claim for prospective relief is moot is different from the issue in this case, which involves claims for damages to remedy past harms. See, *e.g., Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 720 (2007) (plaintiff "sought damages in her complaint, which is sufficient to preserve our ability to consider the question"); *Alvarez, supra*, at 92 (suggesting that a "continuing controversy over damages" would mean that the case was not moot).

As explained above, I would follow history and tradition in construing Article III, and so I find that Campbell-Ewald's mere offers did not deprive the District Court of jurisdiction. Accordingly, I concur in the judgment only.

# SUPREME COURT OF THE UNITED STATES

No. 14–857

CAMPBELL-EWALD COMPANY, PETITIONER
*v.* JOSE GOMEZ

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[January 20, 2016]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA and JUSTICE ALITO join, dissenting.

This case is straightforward. Jose Gomez alleges that the marketing firm Campbell-Ewald (Campbell) sent him text messages without his permission, and he requests relief under the Telephone Consumer Protection Act. That Act permits consumers to recover statutory damages for unauthorized text messages. Based on Gomez's allegations, the maximum that he could recover under the Act is $1500 per text message, plus the costs of filing suit. Campbell has offered to pay Gomez that amount, but it turns out he wants more. He wants a federal court to say he is right.

The problem for Gomez is that the federal courts exist to resolve real disputes, not to rule on a plaintiff's entitlement to relief already there for the taking. As this Court has said, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines* v. *Byrd*, 521 U. S. 811, 818 (1997) (quoting *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 37 (1976)). If there is no actual case or controversy, the lawsuit is moot, and the power of the federal courts to declare the law has come to an end. Here, the District Court found that Campbell

agreed to fully satisfy Gomez's claims. That makes the case moot, and Gomez is not entitled to a ruling on the merits of a moot case.

I respectfully dissent.

## I
## A

In 1793, President George Washington sent a letter to Chief Justice John Jay and the Associate Justices of the Supreme Court, asking for the opinion of the Court on the rights and obligations of the United States with respect to the war between Great Britain and France. The Supreme Court politely—but firmly—refused the request, concluding that "the lines of separation drawn by the Constitution between the three departments of the government" prohibit the federal courts from issuing such advisory opinions. 3 Correspondence and Public Papers of John Jay 486–489 (H. Johnston ed. 1890–1893).

That prohibition has remained "the oldest and most consistent thread in the federal law of justiciability." *Flast* v. *Cohen*, 392 U. S. 83, 96 (1968) (internal quotation marks omitted). And for good reason. It is derived from Article III of the Constitution, which limits the authority of the federal courts to the adjudication of "Cases" or "Controversies." U. S. Const., Art. III, §2. The case or controversy requirement is at once an important check on the powers of the Federal Judiciary and the source of those powers. In *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803), Chief Justice Marshall established that it is "the province and duty of the judicial department to say what the law is." Not because there is a provision in the Constitution that says so—there isn't. Instead, the federal courts wield that power because they have to decide cases and controversies, and "[t]hose who apply [a] rule to particular cases, must of necessity expound and interpret that rule." *Ibid.* Federal courts may exercise their authority

"only in the last resort, and as a necessity in the determination of real, earnest and vital controversy between individuals." *Chicago & Grand Trunk R. Co.* v. *Wellman*, 143 U. S. 339, 345 (1892); see also *Allen* v. *Wright*, 468 U. S. 737, 752 (1984). "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 341 (2006).

A case or controversy exists when both the plaintiff and the defendant have a "personal stake" in the lawsuit. *Camreta* v. *Greene*, 563 U. S. 692, 701 (2011). A plaintiff demonstrates a personal stake by establishing standing to sue, which requires a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U. S., at 751. A defendant demonstrates a personal stake through "an ongoing interest in the dispute." *Camreta*, 563 U. S., at 701.

The personal stake requirement persists through every stage of the lawsuit. It "is not enough that a dispute was very much alive when suit was filed"; the "parties must continue to have a personal stake in the outcome of the lawsuit" to prevent the case from becoming moot. *Lewis* v. *Continental Bank Corp.*, 494 U. S. 472, 477–478 (1990) (internal quotation marks omitted). If either the plaintiff or the defendant ceases to have a concrete interest in the outcome of the litigation, there is no longer a live case or controversy. A federal court that decides the merits of such a case runs afoul of the prohibition on advisory opinions.

### B

Applying those basic principles to this case, it is clear that the lawsuit is moot. All agree that at the time Gomez filed suit, he had a personal stake in the litigation. In his complaint, Gomez alleged that he suffered an injury in

fact when he received unauthorized text messages from Campbell. To remedy that injury, he requested $1500 in statutory damages for each unauthorized text message. (It was later determined that he received only one text message.)

What happened next, however, is critical: After Gomez's initial legal volley, Campbell did not return fire. Instead, Campbell responded to the complaint with a freestanding offer to pay Gomez the maximum amount that he could recover under the statute: $1500 per unauthorized text message, plus court costs. Campbell also made an offer of judgment on the same terms under Rule 68 of the Federal Rules of Civil Procedure, which permits a defendant to recover certain attorney's fees if the Rule 68 offer is unaccepted and the plaintiff later recovers no more than the amount of the offer. Crucially, the District Court found that the "parties do not dispute" that Campbell's Rule 68 offer—reflecting the same terms as the freestanding offer—"would have fully satisfied the individual claims asserted, or that could have been asserted," by Gomez. 805 F. Supp. 2d 923, 927 (CD Cal. 2011).

When a plaintiff files suit seeking redress for an alleged injury, and the defendant *agrees* to fully redress that injury, there is no longer a case or controversy for purposes of Article III. After all, if the defendant is willing to remedy the plaintiff's injury without forcing him to litigate, the plaintiff cannot demonstrate an injury in need of redress by the court, and the defendant's interests are not adverse to the plaintiff. At that point, there is no longer any "necessity" to "expound and interpret" the law, *Marbury*, 1 Cranch, at 177, and the federal courts lack authority to hear the case. That is exactly what happened here: Once Campbell offered to fully remedy Gomez's injury, there was no longer any "necessity" for the District Court

to hear the merits of his case, rendering the lawsuit moot.[1]

It is true that although Campbell has offered Gomez full relief, Campbell has not yet paid up. That does not affect the mootness inquiry under the facts of this case. Campbell is a multimillion dollar company, and the settlement offer here is for a few thousand dollars. The settlement offer promises "prompt payment," App. to Pet. for Cert. 59a, and it would be mere pettifoggery to argue that Campbell might not make good on that promise. In any event, to the extent there is a question whether Campbell is willing and able to pay, there is an easy answer: have the firm deposit a certified check with the trial court.

## II

The Court today holds that Gomez's lawsuit is not moot. According to the Court, "An unaccepted settlement offer— like any unaccepted contract offer—is a legal nullity, with no operative effect." *Ante,* at 7–8 (quoting *Genesis HealthCare Corp.* v. *Symczyk*, 569 U. S. \_\_\_, \_\_\_ (2013) (KAGAN, J., dissenting) (slip op., at 3)). And so, the Court concludes, if a plaintiff does not feel like accepting the

_____

[1] The Court does not reach the question whether Gomez's claim for class relief prevents this case from becoming moot. The majority nevertheless suggests that Campbell "sought to avoid a potential adverse decision, one that could expose it to damages a thousand-fold larger than the bid Gomez declined to accept." *Ante,* at 11. But under this Court's precedents Gomez does not have standing to seek relief based solely on the alleged injuries of others, and Gomez's interest in sharing attorney's fees among class members or in obtaining a class incentive award does not create Article III standing. See *Lewis* v. *Continental Bank Corp.*, 494 U. S. 472, 480 (1990) (An "interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim."); *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 107 (1998) ("Obviously, however, a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself.").

defendant's complete offer of relief, the lawsuit cannot be moot because it is as if no offer had ever been made.

But a plaintiff is not the judge of whether federal litigation is necessary, and a mere *desire* that there be federal litigation—for whatever reason—does not make it *necessary*. When a lawsuit is filed, it is up to the federal court to determine whether a concrete case or controversy exists between the parties. That remains true throughout the litigation. Article III does not require the parties to affirmatively agree on a settlement before a case becomes moot. This Court has long held that when a defendant unilaterally remedies the injuries of the plaintiff, the case is moot—even if the plaintiff disagrees and refuses to settle the dispute, and even if the defendant continues to deny liability.

In *California* v. *San Pablo & Tulare R. Co.*, 149 U. S. 308 (1893), the State of California brought suit against a railroad company for back taxes. Before oral argument in this Court, the railroad offered to pay California the entire sum at issue, "together with interest, penalties and costs." *Id.,* at 313. Although California continued to litigate the case despite the railroad's offer of complete relief, the Court concluded that the offer to pay the full sum, in addition to "the deposit of the money in a bank, which by a statute of the State ha[s] the same effect as actual payment and receipt of the money," mooted the case. *Id.,* at 314.

The Court grounded its decision in *San Pablo* on the prohibition against advisory opinions, explaining that "the court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case." *Ibid.* Although the majority here places great weight on Gomez's rejection of Campbell's offer of complete relief, *San Pablo* did not consider the agreement of the parties to

be relevant to the question of mootness.  As the Court said then, "[n]o stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court." *Ibid.*

More recently, in *Alvarez* v. *Smith*, 558 U. S. 87 (2009), the Court found that a plaintiff's refusal to settle a case did not prevent it from becoming moot.  In *Alvarez*, Chicago police officers had seized vehicles and cash from six individuals.  The individuals filed suit against the city and two officials, claiming that they were entitled to a timely post-seizure hearing to seek the return of their property.  The Court of Appeals ruled for the plaintiffs, and this Court granted certiorari.

At oral argument, the parties informed the Court that the cars and some of the cash had been returned, and that the plaintiffs no longer sought the return of the remainder of the cash.  *Id.*, at 92.  Nevertheless, the plaintiffs—much like Gomez—"continue[d] to dispute the lawfulness of the State's hearing procedures." *Id.,* at 93.  Although the plaintiffs refused to settle the case, and the defendants would not concede that the hearing procedures were unlawful, the Court held that the case was moot.  As the Court explained, the "dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights," and "a dispute solely about the meaning of a law, abstracted from any concrete actual or threatened harm, falls outside the scope of the constitutional words 'Cases' and 'Controversies.'" *Ibid.*

The Court reached a similar conclusion in *Already, LLC* v. *Nike, Inc.*, 568 U. S. \_\_\_ (2013).  In that case, Nike filed suit alleging that two of Already's athletic shoes violated Nike's Air Force 1 trademark.  In response, Already filed a counterclaim alleging that Nike's trademark was invalid.  Instead of litigating the counterclaim, Nike issued a *unilateral* covenant not to sue Already.  In that covenant, Nike "unconditionally and irrevocably" promised not to

raise any trademark or unfair competition claims against Already based on its current shoe designs or any future "colorable imitations" of those designs. *Id.,* at ___ (slip op., at 6). Nike did not, however, admit that its trademark was invalid. After issuing the covenant, Nike asked the District Court to dismiss the counterclaim as moot. *Id.,* at ___ (slip op., at 2).

Already did not agree to Nike's covenant, and it did not view the covenant as sufficient to protect it from future trademark litigation. Already argued that without judicial resolution of the dispute, "Nike's trademarks [would] hang over Already's operations like a Damoclean sword." *Id.,* at ___ (slip op., at 9). This Court disagreed and dismissed the suit. It found that because Nike had demonstrated "that the covenant encompasses all of [Nike's] allegedly unlawful conduct," and that the "challenged conduct cannot reasonably be expected to recur," the counterclaim was moot. *Id.,* at ___ (slip op., at 7–8).

These precedents reflect an important constitutional principle: The agreement of the plaintiff is not required to moot a case. In *San Pablo*, California did not accept the railroad's money in exchange for settling the State's legal claims; in *Alvarez*, the plaintiffs did not receive their cars and cash in return for an agreement to stop litigating the case; and in *Already*, the eponymous shoe company never agreed to Nike's covenant not to sue. In each of those cases, despite the plaintiff's desire not to settle, the Court held that the lawsuit was moot.

The majority attempts to distinguish these precedents by emphasizing that the plaintiffs in all three cases received complete relief, but that is not the point. I had thought that the theory of the Court's opinion was that acceptance is required before complete relief will moot a case. But consider the majority's discussion of *Already*: What did Nike's covenant do? It "afforded Already blanket protection from future trademark litigation." *Ante,* at 10,

n. 5. What happened as a result of this complete relief? "The risk that underpinned Already's standing" thus "ceased to exist." *Ibid.* Even though what? Even though "Nike's covenant was unilateral," and not accepted by Already. *Ibid.*

The majority is correct that because Gomez did not accept Campbell's settlement, it is a "legal nullity" as a matter of contract law. The question, however, is not whether there is a contract; it is whether there is a case or controversy under Article III.[2] If the defendant is willing to give the plaintiff everything he asks for, there is no case or controversy to adjudicate, and the lawsuit is moot.[3]

_____

[2] The majority suggests that this case is analogous to *U. S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, 513 U. S. 18 (1994), where the Court declined to vacate a lower court decision that became moot on certiorari when the parties voluntarily settled the case. *Bancorp* is inapposite—it involves the equitable powers of the courts to vacate judgments in moot cases, not the Article III question whether a case is moot in the first place. The premise of *Bancorp* is that it is up to the federal courts—and not the parties—to decide what to do once a case becomes moot. The majority's position, in contrast, would leave it to the plaintiff to decide whether a case is moot.

[3] To further support its Article III-by-contract theory of the case, the Court looks to Federal Rule of Civil Procedure 68, which states that an unaccepted offer of judgment "is considered withdrawn." Rule 68(b). But Campbell made Gomez both a Rule 68 offer *and* a freestanding settlement offer. By its terms, Rule 68 does not apply to the latter. The majority's only argument with respect to the freestanding settlement offer is that under the rules of contract law, an unaccepted offer is a "legal nullity." *Ante*, at 7. As explained, however, under the principles of Article III, an unaccepted offer of complete relief moots a case.

JUSTICE THOMAS, concurring in the judgment, would decide the case based on whether there was a formal tender under the common law. This suffers from the same flaw as the majority opinion. The question is not whether the requirements of the common law of tender have been met, but whether there is a case or controversy for purposes of Article III. The Supreme Court cases we have discussed make clear that the two questions are not the same. To cite just one example, JUSTICE THOMAS argues that a tender under the common law must include an admission of liability. *Ante,* at 2–3. Our precedents, however, plainly

ROBERTS, C. J., dissenting

\* \* \*

The case or controversy requirement serves an essential purpose: It ensures that the federal courts expound the law "only in the last resort, and as a necessity." *Allen*, 468 U. S., at 752 (internal quotation marks omitted). It is the necessity of resolving a live dispute that reconciles the exercise of profound power by unelected judges with the principles of self-governance, ensuring adherence to "the proper—and properly limited—role of the courts in a democratic society." *Id.,* at 750 (internal quotation marks omitted).

There is no such necessity here. As the District Court found, Campbell offered Gomez full relief. Although Gomez nonetheless wants to continue litigating, the issue is not what the plaintiff *wants*, but what the federal courts may do. It is up to those courts to decide whether each party continues to have the requisite personal stake in the lawsuit, and if not, to dismiss the case as moot. The Court today takes that important responsibility away from the federal courts and hands it to the plaintiff.

The good news is that this case is limited to its facts. The majority holds that an *offer* of complete relief is insufficient to moot a case. The majority does not say that *payment* of complete relief leads to the same result. For aught that appears, the majority's analysis may have come out differently if Campbell had deposited the offered funds with the District Court. See *ante,* at 11–12. This Court leaves that question for another day—assuming there are other plaintiffs out there who, like Gomez, won't take "yes" for an answer.

———————

establish that an admission of liability is not required for a case to be moot under Article III. See *supra,* at 7–8. We are not at liberty to proceed as if those Article III precedents do not exist.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–857

_____

## CAMPBELL-EWALD COMPANY, PETITIONER
## *v.* JOSE GOMEZ

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[January 20, 2016]

JUSTICE ALITO, dissenting.

I join THE CHIEF JUSTICE's dissent. I agree that a defendant may extinguish a plaintiff's personal stake in pursuing a claim by offering complete relief on the claim, even if the plaintiff spurns the offer. Our Article III precedents make clear that, for mootness purposes, there is nothing talismanic about the plaintiff's acceptance. *E.g., Already, LLC* v. *Nike, Inc.*, 568 U. S. \_\_\_ (2013) (holding that Nike's unilateral covenant not to sue mooted Already's trademark invalidity claim). I write separately to emphasize what I see as the linchpin for finding mootness in this case: There is no real dispute that Campbell would "make good on [its] promise" to pay Gomez the money it offered him if the case were dismissed. *Ante,* at 5 (opinion of ROBERTS, C. J.). Absent this fact, I would be compelled to find that the case is not moot.

Our "voluntary cessation" cases provide useful guidance. Those cases hold that, when a plaintiff seeks to enjoin a defendant's conduct, a defendant's "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox* v. *Service Employees*, 567 U. S. \_\_\_, \_\_\_– \_\_\_ (2012) (slip op., at 6–7). To obtain dismissal in such circumstances, the defendant must "'bea[r] the formidable

burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Already*, *supra*, at ___ (slip op., at 4) (quoting *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 190 (2000)). We have typically applied that rule in cases involving claims for prospective relief, see *Knox*, *supra*, at ___ (slip op., at 7), but the basic principle easily translates to cases, like this one, involving claims for damages: When a defendant offers a plaintiff complete relief on a damages claim, the case will be dismissed as moot if—but only if—it is "absolutely clear" that the plaintiff will be able to receive the offered relief. *Already*, *supra*, at ___ (slip op., at 8).[1]

Consider an offer of complete relief from a defendant that has no intention of actually paying the promised sums, or from a defendant whose finances are so shaky that it cannot produce the necessary funds. In both instances, there is a question whether the defendant will back up its offer to pay with an actual payment. If those cases were dismissed as moot, the defendant's failure to follow through on its promise to pay would leave the plaintiff forever emptyhanded. In the language of our mootness cases, those cases would *not* be moot because a court could still grant the plaintiff "effectual relief," *Knox*, *supra*, at ___ (slip op., at 7) (internal quotation marks omitted)— namely, the relief sought in the first place. The plaintiff retains a "personal stake" in continuing the litigation. *Genesis HealthCare Corp.* v. *Symczyk*, 569 U. S. ___, ___ (2013) (slip op., at 4) (internal quotation marks omitted). An offer of complete relief thus will not always warrant dismissal.

––––––––––

[1] I say it must be clear that the plaintiff "will *be able to* receive" the relief, rather than that the plaintiff "*will* receive" the relief, to account for the possibility of an obstinate plaintiff who refuses to take any relief even if the case is dismissed. A plaintiff cannot thwart mootness by refusing complete relief presented on a silver platter.

Campbell urges that a plaintiff could simply move to reopen a dismissed case if a defendant fails to make good on its offer. Reply Brief 10. I assume that is true. But the prospect of having to reopen litigation is precisely why our voluntary cessation cases require defendants to prove, *before* dismissal, that the plaintiff's injury cannot reasonably be expected to recur. I see no reason not to impose a similar burden when a defendant asserts that it has rendered a damages claim moot.

How, then, can a defendant make "absolutely clear" that it will pay the relief it has offered? The most straightforward way is simply to pay over the money. The defendant might hand the plaintiff a certified check or deposit the requisite funds in a bank account in the plaintiff's name. See *California* v. *San Pablo & Tulare R. Co.*, 149 U. S. 308, 313–314 (1893). Alternatively, a defendant might deposit the money with the district court (or another trusted intermediary) on the condition that the money be released to the plaintiff when the court dismisses the case as moot. See Fed. Rule Civ. Proc. 67; 28 U. S. C. §§2041, 2042. In these situations, there will rarely be any serious doubt that the plaintiff can obtain the offered money.[2]

—————

[2] Depositing funds with the district court or another intermediary may be particularly attractive to defendants because it would ensure that the plaintiff can obtain the money, yet allow the defendant to reclaim the funds if the court refuses to dismiss the case (for example, because it determines the offer is for less than full relief). Contrary to the views of Gomez's *amicus*, there is no reason to force a defendant to effect an "'irrevocable transfer of title'" to the funds without regard to whether doing so succeeds in mooting the case. Brief for American Federation of Labor and Congress of Industrial Organizations 10. Likewise, because I believe our precedents "provide sufficiently specific principles to resolve this case," I would not apply the "rigid formalities" of common-law tender in this context. *Ante*, at 1, 2 (THOMAS, J., concurring in judgment). Article III demands that a plaintiff always have a personal stake in continuing the litigation, and that stake is extinguished if the plaintiff is freely able to obtain full relief in the event the case is dismissed as moot.

While outright payment is the surest way for a defendant to make the requisite mootness showing, I would not foreclose other means of doing so. The question is whether it is certain the defendant will pay, not whether the defendant has already paid. I believe Campbell clears the mark in this case. As THE CHIEF JUSTICE observes, there is no dispute Campbell has the means to pay the few thousand dollars it offered Gomez, and there is no basis "to argue that Campbell might not make good on that promise" if the case were dismissed. *Ante*, at 5. Thus, in the circumstances of this case, Campbell's offer of complete relief should have rendered Gomez's damages claim moot. But the same would not necessarily be true for other defendants, particularly those that face more substantial claims, possess less secure finances, or extend offers of questionable sincerity. Cf. *Already*, 568 U. S., at ___–___ (KENNEDY, J., concurring) (slip op., at 3–4) (emphasizing the "formidable burden on the party asserting mootness" and noting possible "doubts that Nike's showing [of mootness] would suffice in other circumstances").

The Court does not dispute Campbell's ability or willingness to pay, but nonetheless concludes that its unaccepted offer did not moot Gomez's claim. While I disagree with that result on these facts, I am heartened that the Court appears to endorse the proposition that a plaintiff's claim *is* moot once he has "received full redress" from the defendant for the injuries he has asserted. *Ante*, at 10, n. 5 (discussing *Already*, *supra*, and *Alvarez* v. *Smith*, 558 U. S. 87 (2009)). Today's decision thus does not prevent a defendant who actually pays complete relief—either directly to the plaintiff or to a trusted intermediary—from seeking dismissal on mootness grounds.[3]

————————

[3] Although it does not resolve the issue, the majority raises the possibility that a defendant must *both* pay the requisite funds *and* have "the court . . . ente[r] judgment for the plaintiff in that amount." *Ante*, at 11.

ALITO, J., dissenting

---

I do not see how that can be reconciled with *Already*, which affirmed an order of dismissal—not judgment for the plaintiff—where the plaintiff had received full relief from the defendant. *Already, LLC* v. *Nike, Inc.*, 568 U. S. \_\_\_, \_\_\_–\_\_\_, \_\_\_ (2013) (slip op., at 2–3, 15).