NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0313n.06

No. 20-5170

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| BRIAN WOODCOCK, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CORRECT CARE SOLUTIONS, et al., | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendants-Appellees. | ) | |
| | ) | |

FILED
Jul 06, 2021
DEBORAH S. HUNT, Clerk

BEFORE: BATCHELDER, GRIFFIN, and STRANCH, Circuit Judges.

BATCHELDER, J., delivered the opinion of the court in which GRIFFIN, J., joined. STRANCH, J. (pp. 13–22), delivered a opinion concurring in part and dissenting in part.

**ALICE M. BATCHELDER**, **Circuit Judge.** In this class action brought pursuant to 42 U.S.C. § 1983, approximately 1,200 Kentucky inmates with Hepatitis C Virus (HCV) ("Plaintiffs") sued eight defendants who manage the Kentucky prison system's HCV-treatment program ("Defendants"). Plaintiffs claim that by triaging the HCV cure for the most seriously affected inmates, Defendants were deliberately indifferent to their serious medical needs, in violation of the Eighth and Fourteenth Amendments. The district court granted summary judgment for Defendants, holding that Defendants adequately treated Plaintiffs. We **AFFIRM**.

## I.  FACTS & PROCEDURAL HISTORY

### A.  Hepatitis C Virus

HCV is a bloodborne virus commonly spread by sharing contaminated needles, using unsterilized tattoo equipment, and engaging in sexual behavior.  The most common HCV symptoms range from fatigue and jaundice to severe inflammation, skin lesions, and cognitive impairment.  HCV is categorized as either acute or chronic.  In the acute phase, HCV does not cause noticeable symptoms and some people clear the virus from their systems within six to twelve months.  Those who do not clear the virus suffer from chronic HCV.[1]  In the chronic phase, HCV is progressive and attacks the liver, which, over time, causes scarring or fibrosis.  The rate at which the virus causes scarring varies from person to person.  Some people might not develop scarring for 20 to 30 years, while others might suffer accelerated scarring.  Between 20 and 40 percent of people who have chronic HCV eventually develop cirrhosis, which is a severe condition causing the liver's affected areas to stop functioning.

There is no vaccine for HCV.  In years past, doctors treated the virus with an injectable medication called interferons.  This treatment is marginally effective; it requires that patients stay sober, causes several unpleasant side effects, and has a success rate of 30 percent.  Fortunately, in 2011, the FDA approved a new class of drugs called direct-acting antivirals (DAAs), which cure nearly all the HCV patients who take them.  But the treatment comes at a price; a single course of treatment costs between $13,000 and $32,000.

---

[1] Medication is necessary to cure chronic HCV.

**B. HCV in Kentucky State Prisons**

HCV infects about one percent of the United States population, but it is far more prevalent in prisons. The Kentucky Department of Corrections (KDOC) estimates that about 1,200 of its 12,000 inmates have HCV.

In 2015, the KDOC implemented a new "HCV Treatment Plan," which it updated in 2017, 2018, and 2020. This HCV Treatment Plan mostly mimics the Federal Bureau of Prison's HCV treatment protocol. The 2018 version of the HCV Treatment Plan is at issue in this appeal and has several components, ranging from inmate screening to DAA treatment.

First, the KDOC screens its inmates for HCV. It obtains all inmates' health history and tests for antibodies inmates who (1) have certain clinical conditions such as a reported history of HCV or elevated levels of Alanine Aminotransferase (ALT), (2) have risk factors such as blood-transfusion treatment or sharing needles and tattoo guns, or (3) request HCV testing.

If an inmate tests positive for HCV antibodies, the KDOC (1) evaluates the inmate for signs and symptoms of liver disease, (2) obtains additional laboratory tests, (3) calculates the inmate's APRI score (which is used to assess the degree of liver fibrosis, if any), (4) offers vaccines for hepatitis A, influenza, and pneumococcal, and (5) educates the inmate about chronic HCV.

Finally, the KDOC places each infected inmate into one of three priority groups based on several factors. Inmates placed in priority level one, the highest level, have an APRI score of above 2.0 and/or other comorbid medical conditions that warrant immediate treatment. Inmates with APRI scores between .07 and 2.0 and those with advanced fibrosis, diabetes, liver disease, or kidney disease comprise priority level two. The KDOC places all other infected inmates in level three. There are, however, exceptions to the priority-level treatment system. For example, an

inmate in priority level three may receive DAAs before a priority-level-one inmate if he or she exhibits an urgent medical need.

Infected inmates are monitored and reevaluated every three to six months, depending on their health status. As part of the inmate's individualized care, KDOC Regional Medical Director, Dr. Frederick Kemen, subject to his medical judgment, might order further testing as he deems necessary, such as HCV genotyping or a FibroScan[2] of the inmate's liver.

Before 2020, the HCV Treatment Plan required that HCV-infected inmates qualify for DAA treatment. For example, an inmate is disqualified from receiving treatment if, among other things, he or she (1) has a life expectancy of fewer than eighteen months, (2) had finished DAA treatment and has since been reinfected with HCV, (3) had demonstrated an unwillingness or inability to adhere to rigorous medication regimens, or (4) did not have a clear conduct record for twelve months before treatment (i.e., no positive drug tests, prison tattoos, nor inappropriate sexual behavior).

### C. Procedural History

The named Plaintiffs are inmates in KDOC prisons who have been diagnosed with HCV. Brian Woodcock is housed at the Kentucky State Penitentiary (KSP) and has been cured of HCV. Keath Bramblett, another inmate at KSP, contracted HCV during incarceration and has since been cured. Ruben Rios Salinas is housed at KSP and has been diagnosed with HCV but was denied

---

[2] A HCV genotype test determines the specific subtype of the virus to help guide a medical provider's treatment of the patient. *See* Hepatitis C Genotypes, U.S. Dep't of Veterans Aff., https://www.hepatitis.va.gov/hcv/background/genotypes.asp. A FibroScan is a noninvasive test that uses ultrasound technology to determine the degree of a patient's liver fibrosis. *Understanding your FibroScan Results*, Mem'l Sloane Kettering Cancer Ctr. (Feb. 27, 2018), https://www.mskcc.org/cancer-care/patient-education/understanding-your-fibroscan-results/.

DAA treatment. And Jessica Lawrence has been diagnosed with HCV but has not received DAA treatment.

Defendants are various persons or entities charged with formulating and managing the HCV Treatment Plan and each person is sued in his or her individual capacity. Rodney Ballard and LaDonna Thompson are former KDOC Commissioners. Doug Crall, M.D., is the former Medical Director of the KDOC. Cookie Crews is the KDOC Health Services Administrator. Frederick Kemen, M.D., is responsible for managing the HCV Treatment Plan. Denise Burkett is the KDOC Medical Director, responsible for policies, procedures, and employment concerning the inmates' medical care. And Correct Care Solutions, Inc. provides medical services to KDOC inmates.

In 2015, Ruben Salinas sued in Kentucky state court seeking a writ of mandamus to order then-Commissioner LaDonna Thompson, the KDOC, and the Commonwealth of Kentucky, to treat his HCV. In November 2016, Salinas filed a "First Amended Class-action Complaint," adding Woodcock and Bramblett as plaintiffs, and Ballard, Crall, Crews, Kemen, and Correct Care Solutions as defendants. In December 2016, Defendants removed the case to the District Court for the Eastern District of Kentucky. Nine months later, Lawrence moved to intervene, adding Thompson's successor and former Commissioner James Erwin, which the magistrate judge granted.[3] The district court certified Plaintiffs' class as "all inmates in Kentucky prisons who have been diagnosed, or will be diagnosed, with chronic hepatitis C virus (HCV) for the purpose of injunctive relief." The court appointed Salinas and Lawrence as class representatives. *Woodcock v. Correct Care Sols., LLC*, No. 3:16-CV-00096-GFVT, 2019 WL 3068447, at *11 (E.D. Ky. July 12, 2019).

---

[3] The district court eventually dismissed Erwin upon Plaintiffs' motion.

After considerable motion practice, Plaintiffs filed their Third Amended Class-action Complaint in which they alleged that Defendants, following the 2018 HCV Treatment Plan, failed to provide medical treatment to HCV inmates because they did not treat all HCV-infected inmates with DAAs. Specifically, Plaintiffs brought claims under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments on the ground that Defendants acted with deliberate indifference to their serious medical needs, and under the Americans with Disabilities Act and the Rehabilitation Act of 1978 for failure to reasonably accommodate their medical needs. Plaintiffs also brought state-law tort claims of negligence, gross negligence, and intentional infliction of emotional distress.

Defendants moved for summary judgment on all claims. The district court dismissed Woodcock and Bramblett's claims because they had failed to exhaust their administrative remedies and because, inasmuch as their HCV has been cured, they cannot be members of the class. The court granted summary judgment to Defendants on the § 1983, disability, and punitive damages claims, and returned their state-law claims to Kentucky state court. *Woodcock v. Correct Care Sols., LLC*, No. 3:16-CV-00096, 2020 WL 556391, at *9 (E.D. Ky. Feb. 4, 2020).

Important to this appeal, the district court held that Plaintiffs' Eighth and Fourteenth Amendment claims failed because Plaintiffs did not provide evidence demonstrating that Defendants were deliberately indifferent to Plaintiffs' serious medical needs. According to the district court, Plaintiffs failed to prove either the objective or subjective component of deliberate indifference. In analyzing the objective component, the court determined that the KDOC provided adequate treatment for HCV-infected inmates by diagnosing HCV and monitoring its progression. *Id.* at *6. As for the subjective component, the court concluded that the treatment was not so grossly incompetent or excessive as to shock the conscience. *Id.* at 6–7.

Plaintiffs timely appeal the order granting summary judgment to Defendants on the § 1983 and punitive damages claims. They argue that Defendants' refusal to provide DAAs to every HCV-infected inmate amounts to deliberate indifference in violation of the Eighth and Fourteenth Amendments.

## II. DISCUSSION

We review de novo the grant of summary judgment. *Laster v. City of Kalamazoo,* 746 F.3d 714, 726 (6th Cir. 2014). In doing so, we view the evidence and reasonable inferences in the light most favorable to the non-moving party, but we need not draw unreasonable inferences in the nonmovant's favor. *Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). "The ultimate question is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 290 (6th Cir. 2015) (internal quotation marks and citation omitted).

## A. Mootness

Before we reach the merits of Plaintiffs' claims, we must assess whether KDOC's 2020 amendments to the HCV Treatment Plan moot Plaintiffs' claims for injunctive relief. In late 2020, while this appeal was pending, the KDOC informed the court that it had made several changes to the HCV Treatment Plan. First, it created an opt-out testing protocol by which all KDOC inmates are offered voluntary screening for HCV, including screening for those who initially refused. Second, it added birth cohort 1945–1965 to the plan's priority-level-two criteria. Third, it removed the disqualification factor based on re-infection after previously receiving DAAs. And fourth, it

elucidated that for patients who have not received DAAs, the no-disciplinary-infractions-within-twelve-months exclusionary factor applies only to conduct that would compromise treatment.

Article III of the United States Constitution limits the power of the federal courts to cases or controversies. U.S. Const. art. III, § 2. "The 'case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)). A federal court "lacks jurisdiction to consider any case or issue that has lost its character as a present, live controversy and thereby becomes moot." *Demis v. Sniezek*, 558 F.3d 508, 512 (internal quotation marks omitted). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (quoting *Int'l Union v. Dana Corp.*, 697 F.2d 718, 720–21 (6th Cir. 1983) (en banc)). Therefore, "[i]f an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013)). But there is an exception to mootness that applies in this case. That exception applies when "one issue in a case has become moot, but the case as a whole remains alive because other issues have not become moot." *Dana Corp.*, 697 F.2d at 721 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981)).

The 2020 HCV Treatment Plan updates address only a portion of Plaintiffs' challenges to the 2018 HCV Treatment Plan. Most notably, the changes do not address the core of Plaintiffs' § 1983 claim: whether Defendants are deliberately indifferent by refusing to treat each HCV-infected inmate with DAAs. Defendants' changes, therefore, do not divest this court of jurisdiction.

**B. § 1983 Claim**

Plaintiffs argue that Defendants' refusal to provide DAAs to every HCV-infected inmate amounted to deliberate indifference in violation of the Eighth and Fourteenth Amendments, and therefore the court erroneously granted Defendants summary judgment.

"Section 1983 provides a federal cause of action against government officials who, while acting under color of state law, deprived the claimant of rights, privileges or immunities secured by the Constitution or laws of the United States." *Rhinehart v. Scutt*, 894 F.3d 721, 735 (6th Cir. 2018) (internal quotation marks and citation omitted). A state prisoner's Eighth and Fourteenth Amendment rights are "violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 569 (6th Cir. 2013) (prisoners' claims under the Eighth and Fourteenth Amendments "are analyzed under the same rubric"). To succeed on that claim, Plaintiffs must prove both an objective and a subjective component. *Atkins v. Parker*, 972 F.3d 734, 739 (6th Cir. 2020). The objective component "requires that the inmate have a sufficiently serious medical need such that she is incarcerated under conditions posing a substantial risk of serious harm." *Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008) (citation and internal quotation marks omitted). The subjective component requires proof that Defendants understood yet consciously disregarded the substantial risk that the serious medical need posed to infected inmates. *Comstock*, 273 F.3d at 703.

Plaintiffs' § 1983 claim fails on the objective component, so we do not reach the subjective component. Here, the parties do not dispute that Plaintiffs have a serious medical need. So, Plaintiffs need only prove that "the alleged deprivation of medical care was serious enough to

violate the Eighth Amendment," *Rhinehart*, 894 F.3d at 737; that is, that it amounted to incarceration "under conditions posing a substantial risk of serious harm," *Ford*, 535 F.3d at 495 (citation omitted). We apply two different standards to decide whether an inmate suffered a constitutional deprivation. One applies when an inmate receives no treatment for a serious medical need, and the other applies when an inmate receives ongoing treatment.

Under the no-treatment standard, when a physician diagnoses a serious medical need, "the plaintiff can establish the objective component by showing that the prison failed to provide treatment." *Rhinehart*, 894 F.3d at 737. Under the ongoing-treatment standard, a plaintiff can establish the objective component by showing that the treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* at 740 (citation omitted). The inmate must proffer evidence that the care was inadequate and that he or she suffered a detrimental effect as a result. *Id.* at 737–38.

The district court applied the ongoing-treatment standard and determined that screening and monitoring HCV-infected inmates under the HCV Treatment Plan constituted treatment and that that treatment was adequate under the Eighth Amendment. *Woodcock,* 2020 WL 556391, at *5–6. Plaintiffs argue that the district court should have applied the no-treatment standard because the 2018 HCV Treatment Plan neither "alleviated" nor "cured" Plaintiffs' HCV. They assert that only the cure provided by DAAs suffices as treatment.

We cannot agree that Plaintiffs received no treatment at all, and at least two of our sister circuits and the Supreme Court have held similarly. In *Roy v. Lawson*, 739 F. App'x 266, 266–67 (5th Cir. 2018) (per curiam), the Fifth Circuit rejected an inmate's argument that even though the prison's "medical personnel regularly . . . monitor[ed] his condition through lab work and blood testing," he received no treatment because the prison failed to give him "the optimum drug

therapies for Hepatitis C." In *Black v. Alabama Dep't of Corr.*, 578 F. App'x 794, 795–96 (11th Cir. 2014) (per curiam), the Eleventh Circuit rejected an inmate's characterization of the case as "a case of denied or delayed treatment" because the prison did not "consider[ ] [him] for antiviral drug treatment," and noted that the prisoner "received regular care and monitoring for his Hepatitis C and medication for his symptoms." And the Supreme Court has held that "X-ray[s] or additional diagnostic techniques" are "forms of treatment." *Gamble*, 429 U.S. at 107. Like the prisons' plans in *Roy* and *Black*, the KDOC plan provides for treatment in the form of diagnosing and monitoring HCV-infected inmates.

Plaintiffs are ultimately complaining about the *adequacy* of their treatment. But an inmate's "disagreement with the testing and treatment he has received," or his "desire for additional or different treatment," does not amount to an Eighth Amendment violation. *Rhinehart*, 894 F.3d at 740 (citation omitted). Here, Plaintiffs have not presented evidence that would allow any reasonable factfinder to conclude that Plaintiffs' treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* at 737 (citation omitted).

The 2018 HCV Treatment Plan provided treatment for Plaintiffs that consisted of several protocols to diagnose and monitor HCV inmates and ultimately administer the expensive DAA treatments to those in immediate need. All inmates could opt-in for testing and, for those who tested positive, the KDOC regularly evaluated their health status, monitored their APRI score, and vaccinated them to mitigate further health risks. Perhaps most importantly, the KDOC's flexible prioritization system enabled Dr. Kemen to exercise his medical judgment and order for inmates more accurate diagnostic testing such as HCV genotyping or a FibroScan so Defendants could

treat with DAAs those inmates in serious need of immediate antiviral treatment, regardless of their place in the prioritization system.

Because Plaintiffs failed to show that the 2018 HCV Treatment Plan put them at substantial risk of serious harm, they cannot show that Defendants were deliberately indifferent. There is no Eighth or Fourteenth Amendment violation.

## C. Punitive Damages

Plaintiffs are not entitled to punitive damages for two reasons. First, Plaintiffs failed to show that Defendants were deliberately indifferent. *See Brown v. Brown*, 46 F. App'x 324, 325 (6th Cir. 2002) (explaining that punitive damages are only available in actions brought under § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of the plaintiff" (citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Second, the class-action complaint sought only injunctive relief. Plaintiffs moved for class certification without mention of punitive damages and the district court's Rule 23(b)(2) analysis and subsequent certification limited the class action to injunctive relief.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

**JANE B. STRANCH, Circuit Judge, concurring in part and dissenting in part.** Inmate populations in prisons across America have significantly higher percentages of chronic Hepatitis C infections than occur in the general public. Many inmates are infected while in correctional facilities. Kentucky has a measured incidence of HCV that is more than twice the national rate. This case challenges the constitutionality of Defendants' policies governing testing and medical response to inmates with HCV. I agree with the majority that the changes to KDOC's HCV plan do not divest us of jurisdiction and that punitive damages are not available to the class that was certified by the district court. I respectfully dissent from the remainder of the opinion.

The Sixth Circuit has repeatedly held that HCV is a serious medical condition under the Eighth Amendment. And this record contains testimony from which a reasonable jury could find that most Defendants were aware of the risks posed to Plaintiffs by chronic, untreated HCV, and recklessly disregarded those risks by rationing the prescription of DAAs and by conducting opt-in HCV testing of inmates rather than opt-out testing. That evidence creates issues of fact as to whether Defendants were deliberately indifferent to Plaintiffs' serious medical needs, making the summary judgment grant to Defendants on Plaintiffs' Eighth Amendment claim inappropriate.

I begin with Plaintiffs' claim that Defendants' failure to provide them with DAAs violates the Eighth Amendment. As the majority explains, the objective component is satisfied when an inmate is incarcerated under conditions posing a "substantial risk of serious harm," *Farmer v. Brennan*, 511 U.S. 825, 828 (1994), such as when he has a serious medical need and receives no treatment for it, *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). Where the inmate has received some treatment for a serious medical need, however, he must present evidence from which a reasonable jury could conclude that the treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."

*Id.* at 737 (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005)). This is a "particularized, fact-specific inquiry." *Miller*, 408 F.3d at 819 (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844 (6th Cir. 2001)).

We have held—and the parties and the majority do not dispute—that hepatitis C is an objectively serious medical condition. *See Atkins v. Parker*, 972 F.3d 734, 739 (6th Cir. 2020). The question, then, is whether a reasonable jury could find that the monitoring provided to Plaintiffs by the KDOC constitutes no treatment or grossly inadequate treatment.

"Treatment," as defined in relevant part by Merriam-Webster, is "the action or way of treating a patient or condition medically or surgically: management and care to prevent, cure, ameliorate or slow progression of a medical condition." *Treatment*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/treatment (last visited June 23, 2021). Similarly, the American Heritage Dictionary defines "treatment" as "[t]he use of an agent, procedure, or regimen, such as a drug, surgery, or exercise, in an attempt to cure or mitigate a disease, condition, or injury." *Treatment*, The American Heritage Dictionary of the English Language, https://www.ahdictionary.com/word/search.html?q=treatment (last visited June 23, 2021). In other words, a "treatment" is a course of decisions and actions intended to improve a medical condition in some way.

Inmates with HCV who do not qualify for DAAs do not receive medical care aimed at curing or mitigated their disease. Instead, they are simply monitored, undergoing retests every three or six months depending on the current status of their disease, using tests that Plaintiffs argue are frequently inaccurate.[1] The results of these tests are used to determine whether, under the

---

[1] According to Plaintiffs, APRI scores indicate only whether a patient's liver is irritated and emitting AST enzymes, not whether it is scarred—indeed, a heavily scarred liver may be incapable of emitting any enzymes. High APRI scores only detect cirrhosis at a rate of 48 percent,

KDOC plan, Plaintiffs are eligible for treatment with DAAs. So the tests themselves do nothing to alleviate an inmate's symptoms or mitigate the progression of the disease, and they have no diagnostic function. Instead, viewing the record in Plaintiffs' favor, as we must, the tests are a tool for Defendants to assess whether a given inmate's disease has cleared the bureaucratic threshold—sufficiently advanced fibrosis—to be eligible for treatment under the protocol. Testing of how far HCV has advanced in harming an inmate's body is not treatment. Indeed, throughout his deposition, Dr. Kemen referred to the testing protocol as "monitoring" that helped him decide which inmates would receive "treatment."

Even if we assume that monitoring qualifies as treatment, there is substantial evidence from which a jury might conclude that treatment is constitutionally inadequate. "The objective component of an Eighth Amendment claim is . . . contextual and responsive to 'contemporary standards of decency.'" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)). HCV may manifest with a wide range of symptoms, including diabetes, neurocognitive dysfunction, porphyria cutanea tarda (a condition that causes painful lesions on sun-exposed skin), headache, fatigue, muscle and joint pain, and skin conditions. And it causes mostly irreversible liver scarring, increasing patients' risk of liver cancer and liver failure even after their HCV has been cured. Indeed, once an individual develops advanced liver disease, he must undergo cancer screening at regular intervals for the rest of his life, even after being cured of the underlying HCV infection. Chronic untreated HCV also increases a patient's risk of heart disease, cancer, kidney disease, immune disease, and diabetes. According to studies, administering HCV treatment at an early stage of fibrosis increases overall survival rates for

---

which Plaintiffs argue means that Defendants' screening criteria may be missing 52 percent of individuals whose livers are actively cirrhotic.

patients compared with treatment at a later stage. As a result of the increased risk to life posed by late treatment, the American Association for the Study of Liver Diseases and the Infectious Diseases Society of America (AASLD/IDSA) recommend administering DAAs—which are highly efficacious and nearly side-effect-free—to most patients with chronic HCV without regard to their degree of fibrosis. No other treatment is recommended. Treatment with DAAs regardless of fibrosis score is also the standard of care set by the Centers for Disease Control, the Centers for Medicare & Medicaid Services, the Veteran's Administration, and multiple state Medicaid systems, including Kentucky's. *See* Trooskin Expert Report VI, R. 68-1, PageID 1042; *Hepatitis C Questions and Answers for Health Professionals* (last visited Dec. 30, 2020), https://www.cdc.gov/hepatitis/hcv/hcvfaq.htm#d1; *Assuring Medicaid Beneficaries Access to Hepatitis (HCV) Drugs*, U.S. Dep't of Health & Human Servs., Release No. 172 (Nov. 5, 2015), https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/downloads/rx-releases/state-releases/state-rel-172.pdf (explaining that DAAs are "medically necessary" for those infected with HCV, and limiting treatment to beneficiaries with high fibrosis scores is "unreasonabl[e]"); *VA Research on Hepatitis C*, U.S. Dep't of Veterans Affairs Office of Research & Development (last visited July 1, 2021), https://www.research.va.gov/topics/hep-c.cfm; *Hepatitis C: State of Medicaid Access Report Card*, National Viral Hepatitis Roundtable, *et al.* (2017), *available at* https://stateofhepc.org/wp-content/themes/infinite-child/reports/HCV_Report_Kentucky.pdf.

Plaintiffs' evidence suggests that by flouting the recognized standard of care, KDOC consigns thousands of prisoners with symptomatic, chronic HCV to years of additional suffering and irreversible liver scarring, despite the availability of early treatment with effective, easily tolerated alternatives that would prevent those long-term harms. Indeed, "delaying treatment for

inmates with chronic hepatitis C causes precisely the type of 'substantial risk of serious harm,' *see Farmer*, 511 U.S. at 837 [], routinely recognized in the Eighth Amendment context." *Atkins*, 972 F.3d at 741 (Gilman, J., dissenting). Plaintiffs' claim is therefore more than a mere "disagreement" with the essentially adequate testing and treatment they have already received. *Rhinehart*, 894 F.3d at 740. Instead, they offered substantial evidence that Defendants' decision to withhold that treatment from most inmates and provide only testing for administrative purposes is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* at 737 (quoting *Miller*, 408 F.3d at 819). A reasonable jury could agree, and so summary judgment on the objective prong is inappropriate.

The majority opinion concludes, however, that KDOC's testing is undisputedly adequate treatment. In deciding to apply the "ongoing treatment" standard, the majority relies on two unpublished, out-of-circuit cases, which do not govern here, and the Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). But in *Gamble*, unlike in this case, the plaintiff had already received some treatment—the doctor identified his injury as a lower back strain, and prescribed bed rest and medications. *Id.* The plaintiff objected that his doctor was constitutionally required to do more "by way of diagnosis and treatment," but the Supreme Court disagreed, holding that "the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment,"[2] and the decision "not to order . . . like measures[] does not represent cruel and unusual punishment." *Id.* This discussion was focused on whether the doctor, who had undisputedly provided some treatment and

---

[2] A close reading of this language illustrates the majority opinion is incorrect in stating that "the Supreme Court has held that 'X-ray[s] or additional diagnostic techniques' are 'forms of treatment.'" Maj. Op. at 11 (quoting *Gamble*, 429 U.S. at 107). The Court's use of the disjunctive "or" suggests instead that X-rays and diagnostic techniques are not forms of treatment.

decided that further action was not medically necessary, had the subjective state of mind required for an Eighth Amendment claim. It is not applicable to the issue here: whether a protocol that authorizes only testing for most inmates and allocates treatment according to an administrative guideline rather than medical judgment, is objectively adequate under the Constitution. A reasonable jury could conclude that the protocol is not an exercise of medical judgment that results in an excusable "inadvertent failure to provide adequate medical care." *See id.* at 105.

That the KDOC plan permits the medical director to order further testing or make exceptions to the prioritization system does not alter this conclusion. First, there is evidence in the record to suggest Dr. Kemen rarely exercised that discretion. He testified that at the time of his deposition, no priority level 3 inmates were receiving treatment, only monitoring. And an undated patient log of his shows that at the time, only 13 of 76 priority level 2 patients had received treatment, while 2 of 68 priority level 3 patients had received treatment. Moreover, his testimony suggested that when he did make exceptions, his decisions were constrained by the KDOC's medically unsupported, cost-driven administrative rule that only patients with advanced fibrosis may receive treatment. For example, he testified, he reviews the "chronic care labs and notes" for patients at priority levels 1 and 2 to determine "whether they're progressing or not." A reasonable jury could therefore find that even though the KDOC plan gives the medical director some level of flexibility, he is not ultimately exercising independent medical judgment.

Our recent decision in *Atkins* further demonstrates that issues of fact remain as to the objective prong. In that case, a class of inmates challenged the HCV treatment policy of the Tennessee Department of Corrections (TDOC), under which infected inmates receive blood testing and monitoring, and the inmates with the most extensive liver scarring receive treatment with DAAs. 972 F.3d at 737–38. Like the majority today, the *Atkins* district court concluded that the

TDOC policy constituted treatment that was not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness," and so the objective prong was not met. *Atkins v. Parker*, 412 F. Supp. 3d 761, 778, 782 (M.D. Tenn. 2019) (quoting *Rhinehart*, 894 F.3d at 749). On appeal, however, we simply concluded that "[e]veryone agree[d] that hepatitis C is an objectively serious medical condition," and that the defendant understood the risks of the disease; the only question was whether he had the requisite subjective intent. *Atkins*, 972 F.3d at 739. We did not ask whether the defendant's monitoring plan constituted treatment or whether it was adequate, despite the district court's conclusions and the parties' briefing on the issue. (*See* Br. of Plaintiff-Appellant at 22–30, *Atkins v. Parker*, 972 F.3d 734 (6th Cir. 2020); Br. of Defendant-Appellee at 23–35, *Atkins v. Parker*, 972 F.3d 734 (6th Cir. 2020)) This suggests the *Atkins* decision recognized that the objective prong was satisfied, as it is here.

The subjective prong requires that defendants knew of and disregarded an excessive risk to the inmate's health and safety. *Winkler v. Madison Cnty.*, 893 F.3d 877, 890–91 (6th Cir. 2018). For that prong, "a decision to provide an 'easier and less efficacious treatment' may suffice to establish deliberate indifference." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017) (quoting *Warren v. Prison Health Servs., Inc.*, 576 Fed. App'x. 545, 552 (6th Cir. 2014) (quoting *Estelle*, 429 U.S. at 104 n. 10)).

Here, there is ample evidence that Defendants were well aware of the long-term harm caused by delaying treatment for HCV and the universal medical recommendation that all individuals with chronic HCV should be prescribed DAAs. Yet according to Defendants themselves, they chose not to administer DAAs to all inmates because of the cost of the drugs, a decision that exposed inmates to ongoing suffering and long-term organ damage. That is not a medical judgment to which deference could be granted—it is an impermissible decision to avoid

providing "the only effective treatment" to most inmates on the sole basis that rationing care is "easier" and cheaper. *Darrah*, 865 F.3d at 372. As Judge Gilman persuasively argued in his dissent in *Atkins*, lack of funding is no excuse for a constitutional violation. 972 F.3d at 742–46; *see also Watson v. City of Memphis*, 373 U.S. 526, 537 (1963). Doctors may consider cost in choosing among several reasonable options, but they may not "refuse to treat a patient who has a serious medical need . . . merely to avoid paying the bill." *Id.* (citing *Darrah*, 865 F.3d at 372); *see also Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (en banc) ("While the cost of treatment is a factor in determining what constitutes adequate, minimum-level care, medical personnel cannot simply resort to an easier course of treatment that they know is ineffective."). A reasonable jury could therefore find that the KDOC plan violates the Eighth Amendment.

The majority opinion does not address the branch of Plaintiffs' claim based on KDOC's HCV testing protocol. Under the 2018 KDOC plan, new inmates had to opt in to receive HCV testing; Plaintiffs contend testing should be opt-out.[3] Due to the significantly higher HCV rates

---

[3] The 2020 KDOC plan implements opt-out testing, which Defendants argue moots Plaintiffs' request for injunctive relief. Voluntary cessation of unlawful conduct will only moot a case when "subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to occur." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). Although governmental actions are presumed to be in good faith, ad hoc or discretionary administrative actions receive less solicitude. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767–68 (6th Cir. 2019). Here, KDOC has offered no guarantees that it will not revert to the opt-in testing protocol, and it maintains that its previous plan was constitutional. "Although not dispositive, the Supreme Court has found whether the government 'vigorously defends the constitutionality of its . . . program' important to the mootness inquiry." *Id.* at 770 (alteration in original) (quoting *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007)). Further, this Court has held, the cessation of conduct in response to litigation "shows a greater likelihood that it could be resumed." *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 342–43 (6th Cir. 2007); *Schlissel*, 939 F.3d at 769 (university's action after complaint was filed "raise[d] suspicions that its cessation [was] not genuine" and "increase[d] [its] burden to prove that its change is genuine"). KDOC failed to satisfy its burden of demonstrating that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189.

within correctional facilities, the AASLD/IDSA and the federal Bureau of Prisons recommend conducting opt-out testing in prisons. Opt-in testing, Plaintiffs argue, fails to capture many infected inmates, placing them at substantial risk of disease and long-term harm without diagnosis and treatment, and exposes uninfected inmates to a high risk of infection.

Defendants testified that they are aware of the increased risk of HCV transmission within prisons and recognize that undetected HCV infections pose a risk to other inmates. Burkett, for example, explained that when infected people do not know they have HCV, that "absolutely" contributes to the spread of infection. And it is KDOC policy that once someone tests positive for HCV, they are prohibited from working in food services or beauty shops because of the risk of transmission. Defendants could offer no reason for implementing opt-in testing, except Kemen's claim that this is the "tradition." But that decision is at odds with the fact that KDOC tests inmates for syphilis and tuberculosis at intake, and the fact that an HCV antibody test costs only eight dollars.

A reasonable jury could determine from this evidence that Defendants are aware HCV infection is widespread among KDOC inmates and in KDOC facilities and poses a risk to the prison population at large. That jury could also conclude that Defendants chose to turn a blind eye to these dangers by implementing opt-in testing. Refusing to confirm or act on inferences of risk that a medical professional "strongly suspect[s] to exist" is the essence of recklessness. *See Rouster v. Cty. of Saginaw*, 749 F.3d 437, 451 (6th Cir. 2014) (quoting *Farmer,* 511 U.S. at 843 n.8).

Chronic HCV subjects infected inmates to substantial risks of serious harm—from pain to disabling conditions to cirrhosis and to death. No one disputes that those risks increase the longer a person is infected. Yet instead of providing testing and treatment once an infection is detected—

the standard of care universally advocated by medical and public health professionals—Defendants have implemented a care-rationing plan that withholds medical treatment until the damage caused by an inmate's chronic Hepatitis C infection has progressed too far to be reversible. And while that disease is spreading throughout the Kentucky prison system, the KDOC protocol tests only those inmates who opt in, exposing other inmates to a heightened risk of infection. A reasonable jury could find this to be evidence of deliberate indifference to a substantial risk to inmate health, in violation of the Eighth Amendment. I would therefore reverse the judgment of the district court and remand this case for trial.